IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE |
| v. | : | |
| | : | No. 2:17-CR-37(RWS)(JCF) |
| TERRYL SEESE | : | |
| _____ | : | |

DEFENDANT'S POST-HEARING BRIEF

**Facts**

At some undetermined time, Game Warden Adam Loudermilk was put in contact with an anonymous tipster who indicated an individual was hunting over bait.[1] (Tr. 3;7). In that first phone call, the anonymous tipster identified a piece of property and indicated there was a person hunting on the property out of a blind with bait in the area. (*Id*. at 8). The tipster described what road the property was on, that the blind was approximately 150 yards from a point on the road where a telephone box was located, and the property was inside of a gated area which the officer would have to get access to. (*Id*. at 8-9). Officer Loudermilk was familiar with property and knew it was a private nudist resort. (Id. at 41; 48). Because of the nature of the

---

[1] According to Mr. Loudermilk, hunting over bait was a violation of Georgia Law, O.C.G.A. §27-3-9. In 2018, that law was amended to allow hunting over bait on private lands. *See*, https://georgiawildlife.com/georgia-deer-baiting-changes.

1

call and the difficulty associated with getting access to the property, Officer Loudermilk, instructed the tipster to let him know if and when he was someone in the area hunting. (*Id*. at 9-10). After the call, Officer Loudermilk looked up the property on the tax assessor's website and determined the owner was Mr. Seese. (*Id*. at 10).

On November 4, 2017, the tipster again contacted Officer Loudermilk, this time informing him that he (the tipster) had observed a male, dressed in camo, not wearing orange[2], entering the woods with a firearm.[3] (*Id*. 11). Based on this information, Officer Loudermilk decided to respond to the area. As he drove to the property, he happened to see a state trooper whom he asked to accompany him. When he got to the property, it was as he had seen it before: there was a gate with the words "BARE" and "Bell Acres Resort"; and a "private property" sign attached to the fence blocking entrance to the resort. (*Id*. at 13; 42-43; D.Ex. 1 & 2). Officer Loudermilk did not have a means to enter the gated resort[4] and he assumed he would

---

[2] Officer Loudermilk testified it was a violation of Georgia law to hunt without wearing 500 square inches of orange above the waist. (Tr. 12).

[3] The tipster also indicated the male may have been drinking, a fact Officer Loudermilk indicated might indicate another violation of Georgia Law. (Tr. 12 - 13).

[4] The anonymous tipster had originally given the officer the gate code but later retracted his permission to use it. (Tr. 9).

have to use the call box to gain entry. (*Id*. at 13). However, when he got to the gate, there was an unidentified "gentleman" there who asked if the officer needed in, to which Loudermilk replied he did.[5] That unidentified "gentleman" punched in a code and the gate opened. (*Id*. at 13-14).

Once inside the gate the officer noticed a sign that indicated "all visitors and vehicles must be registered in office" but he did not stop to register. (*Id*. at 43). Officer Loudermilk followed the directions given to him by the anonymous tipster, parked his vehicle and attempted to find the blind. The property was "kind of thick with a lot of underbrush, smaller trees" so much so that the officer could not see very far because of the "thick underbrush". (*Id*. at 16-17). It was not until the officer was 30 to 40 feet from the blind that was able to see it. (*Id*. at 50). Ultimately, Officer Loudermilk determined there was no one in the blind, but he did see an empty beer can inside, and close in proximity, he saw corn (apparently the bait). (*Id*. at 21). The officer then decided to go to the mobile home he had previously seen located on the property. (*Id*. at 23). At the driveway entrance to the property, Loudermilk had seen a "POSTED" "Private Property" sign. (*Id*. at 45, D.Ex. 4). When he got to the mobile home area Loudermilk saw a picnic table that had approximately 6 beer cans on it. He knocked on the door but no one answered. (*Id*. at 24).

---

[5] Officer Loudermilk did not take any steps to determine if the "gentleman" was a resident of the private resort community. In fact, the officer did not ask the "gentleman" any questions at all. (Tr. 65).

3

While he was standing at the door of the mobile home, the officer heard something in the woods to his right, turned to look, and saw a man who turned out to be Mr. Seese, dressed in full camo, with something in his hands[6] about 20 – 30 yards away. (*Id*.). Mr. Seese knelt down and the officer identified himself, drew his weapon and started walking towards him. (*Id*. at 25; 54). Mr. Seese started to get up and the officer ordered him to show his hands and to get on the ground. Mr. Seese complied and when he raised his hands there was nothing in them. (*Id*. at 25-26). Mr. Seese was placed in handcuffs (behind his back) as he was kneeling on the ground. At that time, the officer began questioning Mr. Seese. He did not read him any *Miranda* warnings. While Loudermilk was questioning the kneeling, handcuffed Mr. Seese, the trooper purportedly located a firearm in the brush behind where Mr. Seese was kneeling.

Loudermilk assisted Mr. Seese to his feet and the two walked back to the mobile home. All the way, Officer Loudermilk held Mr. Seese by the arm. (*Id*. at 57; G. Ex. 1). As they were walking through the thick underbrush, Mr. Seese asked to have the cuffs removed and the officer refused. (*Id*. at 57). Once at the mobile home, the officer had Mr. Seese, still handcuffed behind his back, sit at the picnic table and had him turn so that his legs were under the table so as to make it difficult,

---

[6] Officer Loudermilk testified he could not say it was a firearm, or anything else. All he could say was he saw something. (Tr. 24-25).

4

if not impossible, to get up and leave. (*Id*.). Although Loudermilk eventually removed the handcuffs, he testified unequivocally, Mr. Seese was not free to leave. (*Id*. at 30-31). While Mr. Seese was seated at the picnic table Officer Loudermilk continued to question him without having read him any *Miranda* warnings. On a number of occasions he told Mr. Seese, "don't move", "stay there", and as he left to retrieve equipment from his vehicle, Loudermilk told the state trooper, in a voice audible to Mr. Seese, "Will you watch him for me while I go to my truck." (*Id*. at 58-59). After the officer administered a series of field sobriety tests (that he testified, Mr. Seese failed) Mr. Seese was formally arrested for hunting under the influence and other hunting violations. (*Id*. at 39). *Miranda* warnings were never administered. (Tr. 67).

**Argument and Authority**

I. **Any Evidence Must Be Suppressed Because Law Enforcement Unconstitutionally Entered Property Mr. Seese had a Reasonable Expectation of Privacy In**

As the Supreme Court recently reaffirmed:

> The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. The basic purpose of this Amendment, our cases have recognized, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.

*Carpenter v. United States*, ___ U.S. ___, 136 S.Ct. 2206, 2213 (2018) (internal quotations omitted). While "for much of our history, Fourth Amendment search

5

doctrine was tied to common-law trespass and focused on whether the Government obtains information by physically intruding on a constitutionally protected area," more recently the Court has extended this protection. *Id*. The Court has recognized that "property rights are not the sole measure" and instead has "established that the Fourth Amendment protects people not places, and expanded [its] conception to . . . protect certain expectations of privacy as well." *Id*. (internal quotations and citations omitted). It is now well recognized that "when an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id*. (internal quotations and citation omitted). What the Fourth Amendment is designed to do is two-fold: first it "seeks to secure the privacies of life against arbitrary power"; and second, "to place obstacles in the way of a too permeating police surveillance." (*Id*. at 2214 (citations omitted)).

Here, there can be no question that law enforcement entered, to obtain information, into a "sphere" Mr. Seese sought to keep private. While not his home, Mr. Seese has communal ownership in the private resort community in which his property was located. Moreover, by the objective facts, he (as the other owners) had expressed a subjective expectation of privacy in the property as demonstrated by the erection of a fence, the presence of a locked gate, and signage

6

indicating the property as private.[7]  When determining whether society will recognize such a subjective expectation of privacy such as presented here, courts are to employ a four part analysis:  (1) the proximity of the area to the home; (2) whether the area is included within an area surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the residents to protect the are from observation by people passing by.  *United States v. Dunn*, 480 U.S. 294, 301 (1987).  All four of the Dunn factors weigh in favor of a finding that law enforcement entered a Fourth Amendment protected area.

1. Proximity to the home

Here, law enforcement entered a private nudist resort community without a warrant.  The protected area ensconced Mr. Seese's property, including his mobile home where he often resided.  Further, once inside the protected private resort, law enforcement entered Mr. Seese's private property without a warrant.[8]  That

---

[7] Like the defendant in *Katz v. United States*, 389 U.S. 347 (1967), Mr. Seese "justifiably relied upon the privacy of the [private nudist resort]."  *Id*. at 353.

[8] Officer Loudermilk testified that as an officer with Georgia's Department of Natural Resources, O.C.G.A. §27-1-20 gave him permission to enter private lands without a warrant.  Regardless of what Georgia law purportedly permits, the Federal Constitution, pursuant to the "supremacy clause" *Collins v. Virginia*, ___ U.S. ___, 138 S.Ct. 1663, 1678 (2018) ("Federal law trumps state law only by virtue of the **Supremacy Clause**, which makes the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties ... the supreme Law of the Land") prohibits warrantless searches of protected property unless the search falls under one of the few, narrowly conscripted exceptions.

7

property was immediately adjacent to his residence.  Like the property in question in *United States v. Seidel*, 794 F. Supp 1098, 1103 (N.D. Fla. 1992), which was two and one half acres in size and immediately adjacent to the home, the property in question here, the private nudist community *and* the private property of Mr. Seese within that private community, are protected by the Fourth Amendment.

    2.     Enclosure Surrounding Home

There is no question the area surrounding the home and the entire community was enclosed.  Defendant's Exhibit 1 and 2 show the fence and gate protecting the resort from the public.  Like the property in *Seidel*, "the area in question encloses the house and is one parcel with a single boundary" unlike the property in *Dunn* in which the house was set off by a fence thus delineating the curtilage from the open fields.  *Id*.  Here, as in *Seidel*, "importantly, the agents crossed the only fence on the property, the fence which marked the boundary of [the private resort which] included his home.  *Id*.  Like in *Seidel*, this factor weighs in favor of the defendant.

    3.     The Nature of Uses to Which the Area is Put

There can be no question that the nature of the use of the property is quintessentially private - - a resort where the residence parade sans clothes.  The critical question of "whether the area harbors the intimate activity associated with . . . the privacies of life." *United States v. Dunn*, 480 U.S. at 300, is clearly

answered "yes."  Clearly, the third *Dunn* factor weighs heavily in Mr. Seese's favor.

> 4. Steps Taken by the Resident to Protect the Area from Outside Observation

This factor also weighs in favor of Mr. Seese.  The resort had a fence around it that is so tall as to block the view from anyone on the outside.  (*See*, Defendant's Exhibits 1 & 2).  There was a gate which was closed and locked at all times and could only be opened with a pass code.  Any visitor would have to use a call box to have the gate opened and even then, would have to register at the resort's office.  Further, within the fence the property is heavily wooded effectively obscuring the view from other properties within.  No one could easily see into the resort where Mr. Seese's property was located, and even from within the resort, one could not easily see onto his land.  Finally, like the defendant in *Seidel*, "the public was intentionally excluded from access to the home and property.

As all four of the *Dunn* factors weigh in favor of a finding that society would recognize Mr. Seese's subjective expectation of privacy as reasonable, Officer Loudermilk's trespass onto Mr. Seese's property to obtain information was unconstitutional.  As the Supreme Court has noted,

> While law enforcement officers need not shield their eyes" when passing by the home "on public thoroughfares, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's


> protected areas. In permitting, for example, visual observation of the home from public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner. *Entick v. Carrington,* 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case undoubtedly familiar to every American statesman at the time of the Founding, states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."

*Florida v. Jardines*, 569 U.S. 1, 8 (2013) (citing, *California v. Ciraolo*, 476 U.S. 207, 213 (1986) and *Boyd v. United States* 116 U.S. 626 (1886)). Because Officer Loudermilk unconstitutionally entered the property without a warrant, everything he discovered thereafter must be suppressed as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471 (1963).

## II.     Any Statements Made by Mr. Seese Must be Suppressed

### A.     The Initial Illegal Entry Renders any Statements Inadmissible

Initially, because any statements made by Mr. Seese were the product of an unconstitutional entry onto property upon which Mr. Seese had a reasonable expectation of privacy, they must be suppressed. As the Supreme Court has noted, "verbal evidence which derives so immediately from an unlawful entry . . . as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Wong Sun v. United States*, 371 U.S. at 485. As more fully detailed above, Mr. Seese had a reasonable expectation of privacy in the property he owned within the fenced, gated, heavily

10

wooded private nudist resort. Officer Loudermilk, without benefit of a warrant or with benefit of any exception to the warrant requirement, entered onto this protected property with the intention of gather information. This violates the Fourth Amendment's protection against unreasonable searches. As there were no *Miranda* warnings issued or any other intervening circumstance to remove the taint from the original unconstitutional intrusion[9] this Court must recommend any statements made by Mr. Seese be suppressed.

    B.    Mr. Seese was in Custody and no *Miranda* Warnings were Administered, Thus, any Statements Obtained Must be Suppressed

The Supreme Court has made clear that when law enforcement questions a person who is in custody that person must be advised of his rights and voluntarily waive them. *Miranda v. Arizona*, 383 U.S. 903 (1963). "Custody" does not necessarily mean "under arrest." Rather, "[a]n individual is 'in custody' of the authorities under *Miranda* if he is deprived of his freedom of action in any significant way, freedom of action is curtailed to a degree associated with formal arrest. *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (internal citations omitted). Here, Mr. Sees was deprived of his freedom in a significant way - - he was placed in handcuffs, physically escorted to a table where he was

---

[9] In fact, the original illegality was exacerbated by the actions of Officer Loudermilk - - placing Mr. Seese in handcuffs behind his back; physically escorting him back to his camper, repeatedly telling him not to move or not to get up, and questioning him about potentially illegal activity without administering him *Miranda* warnings.

told to sit in such a way to make it difficult for him to leave, repeatedly told not to move and not to get up, and when Officer Loudermilk went to retrieve items from his vehicle, he asked the accompanying trooper in a voice loud enough for Mr. Seese to hear, "watch him while I go to my truck". A reasonable person in that situation would not feel free to leave, and as Officer Loudermilk confirmed, Mr. Seese was indeed, not free to leave. Because Mr. Seese was in custody at the time, before Officer Loudermilk could question him, the officer was required to advise him of his right to remain silent, his right to an attorney and ask Mr. Seese if he was willing to waive those rights. He did not and any statement obtained from Officer Loudermilk's questioning must be suppressed.

**Conclusion**

Because law enforcement entered private property wherein Mr. Seese had a reasonable expectation of privacy without a warrant any evidence and any statements obtained as a result of that unconstitutional warrantless entry must be suppressed. Further, because Mr. Seese was in custody as soon as Officer Loudermilk had him on his knees with his hands cuffed behind his back, *Miranda* warnings had to be administered before any questioning occurred. When Officer Loudermilk began questioning Mr. Seese without issuing *Miranda* warnings, any statements given by Mr. Seese were not knowingly and voluntarily made and must be suppressed. This Court should recommend the gun and ammunition found as a

result of the unconstitutional entry should be suppressed and that any statements made by Mr. Seese be suppressed.

Dated, this the 10th day of August, 2018.

>Respectfully submitted,
>
>*/s/   Jeffrey L. Ertel*
>JEFFREY L. ERTEL
>State Bar No. 249966
>
>FEDERAL DEFENDER PROGRAM, INC.
>101 Marietta Street, Suite 1500
>Atlanta, GA  30303
>(404)688-7530
>Jeff_ertel@fd.org
>
>COUNSEL FOR MR.SEESE

CERTIFICATE OF SERVICE

I hereby certify that the foregoing has, in compliance with Local Rule 5.1, been formatted in Times New Roman, 14 Point, electronically filed and electronically served upon counsel for the government:

>William McKinnon, Esq.
>United States Attorney's Office
>6th Floor, Richard B. Russell Bldg.
>75 Ted Turner Drive
>Atlanta, GA  30303

Dated, this the 10th day of August, 2018.

*/s/   Jeffrey L. Ertel*