IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

*v.*

TERRYL SEESE

Criminal Action No.

2:17-CR-037-RWS-JCF

## Government's Response to Defendant's Motion to Suppress

The United States of America, by Byung J. Pak, United States Attorney, and William L. McKinnon, Jr., and Erin Sanders, Assistant United States Attorneys for the Northern District of Georgia, files this response to defendant's motion to suppress evidence and statements. For the reasons set forth below, defendant's motion should be denied.

## INTRODUCTION

Defendant is charged with being a felon in possession of a rifle. The rifle was seized during the course of an investigation conducted by Ranger Adam Loudermilk with the Georgia Department of Natural Resources after he received a tip that Defendant was hunting illegally on his property. After the rifle was seized, Defendant made an admission regarding his possession of the rifle before he was advised of his Miranda rights. At the time defendant had been placed in handcuffs, but was not under formal arrest.

Suppression of the rifle is not warranted here because Ranger Loudermilk, a game warden, acted reasonably when investigating possible hunting violations. After receiving a tip, he entered onto Defendant's fields, searched a hunting blind, approached the front door of Defendant's home, saw Defendant, approached Defendant, and discovered the rifle at issue here. At each step, the tipster's information was corroborated. And at each step, Ranger Loudermilk's investigation comported with his mandate as a conservation ranger under Georgia Law and—as explained below—the Fourth Amendment. For his part, Defendant's brief is notable for what it doesn't do and for what it does. What Defendant doesn't do is argue that the discovery of the rifle is problematic on its own. Rather, he argues only that the seizure of the rifle is fruit of the poisonous tree. But in trying to fashion that tree, what he does is stretch the Fourth Amendment far beyond what Courts have authorized. Ranger Loudermilk never entered Defendant's home, much less searched it. And, before finding the rifle, he didn't search Defendant's body either. Instead, Defendant tries to invoke the Constitutional guarantees against unreasonable searches to manufacture a personal right to privacy throughout an entire neighborhood. His attempt necessarily fails. The Parts below explain, step-by-step, why no such poisonous tree exists. Accordingly, Defendant's motion to suppress the rifle must be denied.

Likewise, suppression of defendant's admission that he knew the rifle was loaded is not warranted. For the same reasons, the statement was not the fruit of the poisonous tree. And at the time Defendant was not under formal arrest; therefore, Miranda warnings were not required.

## STATEMENT OF FACTS

Ranger Adam Loudermilk is employed as a game warden with the Georgia Department of Natural Resources. (T-5). His job is to enforce state game and fish law, boating law, and environmental law, specifically in Banks County, Georgia. (T-5). A few days to a week prior to November 4, 2017, Ranger Loudermilk talked to a caller who wished to remain anonymous who reported that someone was hunting deer on baited land. (T-5-6, 47). Hunting deer using bait is a violation of Georgia law. (T-6). Specifically, the caller advised there was a hunting blind on the property and bait was scattered nearly. (T-8). The caller stated that the hunting blind was located on property that was gated and that he would have to get access to the gated area. (T-9). The caller told Ranger Loudermilk that the hunting blind was located 100-150 feet off the road and that there was a telephone box on the road that would identify where the blind could be found. (T-8-9).

Based on the tipster's information about the location of the blind, Ranger Loudermilk was aware that the blind was located on property that was part of a

3

resort. (T-41). Ranger Loudermilk looked up the property on the county tax assessor's website, got the boundaries for the property, and observed aerial photographs of the property. (T-10). He also determined that defendant owned the property where the tipster said the hunting blind was located. (T-10, 45). Based upon this investigation, Ranger Loudermilk confirmed that the tipster's information about the location of the property was accurate. (T-10-11).

On November 4, 2017, Ranger Loudermilk received additional information from the tipster either by a phone call or by text message. (T-11). The tipster reported that someone had gone onto the property with a rifle wearing camouflage clothing, but not wearing clothing that was orange. (T-11, 48). Not wearing orange while hunting deer or bear is a violation of Georgia law. (T-11-12). The tipster also reported that it appeared that the person had been drinking. (T-12, 48). It is a violation of state law to hunt while under the influence. (T-13).

Based upon this information, Ranger Loudermilk decided to go to the property to investigate. (Id.). He asked a Georgia State Trooper to join him. (Id.). Ranger Loudermilk expected that there would be a gate at the entrance to the property and that he would need to seek assistance to enter the property. (Id.). When he got to the gate, a man was sitting near the gate who used his code to let Ranger Loudermilk and the Trooper inside. (T-14). The tipster had given Ranger

4

Loudermilk specific directions about how to get to the hunting blind. (Id.).

Following these directions, Ranger Loudermilk verified that the directions were

accurate and he found the location where the tipster said he should park his

vehicle. (T-14-15, 49). The tipster had told him that there was a camper on the

property and Ranger Loudermilk could see the camper from the road. (T-15, 50).

The tipster had explained that the person using the hunting blind would not be able

to see him on the road. (T-15). Ranger Loudermilk confirmed this because he could

not see the hunting blind from the road. (T-15, 50). Based on Ranger Loudermilk's

previous investigation, he believed that the hunting blind and the camper were on

Defendant's property. (T-15).

Georgia law authorizes game wardens to enter private property without a search

warrant in performance of their duties. (T-16). Ranger Loudermilk and the Trooper

walked onto defendant's property to investigate whether someone was illegally

hunting on the property. (Id.). The property was covered with thick underbrush and

small trees to the extent that Ranger Loudermilk could not see very far. (T-17).

After walking in about 100-200 feet, Ranger Loudermilk saw the hunting blind in

front of him. (Id.). As he approached the blind, he called out to announce his

presence. (T-21, 50). As he got close to the blind, he realized that no one inside. (T-

21, 51). He looked inside and confirmed that no one was there. (Id.). When he did

so, he saw an empty beer can inside. (Id.). He also saw that corn had been scattered on ground in front of the blind. (T-21, 51).

Ranger Loudermilk decided to approach the trailer, knock on the door, and speak with the occupant about the hunting violations that he was investigating. (T-23). When he got close to the trailer, he observed about six beer cans sitting on a picnic table. (Id.). When he knocked on the door, no one answered. (T-23, 52). While he was at the door, he heard a noise to his right. (Id.). When he turned around, he saw defendant about 20-30 yards away. (Id.). Ranger Loudermilk could see that defendant was wearing full camouflage clothing, but no orange. (Id.). He could also see that defendant had something in hand, but he could not tell what it was. (T-24-25, 53). As Ranger Loudermilk made eye contact with defendant, defendant kneeled down on the ground. (Id.). Ranger Loudermilk believed defendant was trying to hide something from him. (T-25). Ranger Loudermilk and the Trooper identified themselves and began to walk toward defendant. (T-26, 54). As they did so, Ranger Loudermilk drew his weapon and ordered defendant to show his hands. (Id.). Defendant held his hands up, raised up, and began to walk toward Ranger Loudermilk. (Id.). Ranger Loudermilk told defendant to get down on the ground. (T-26, 54). After hearing the command to get down on the ground several times defendant complied. (T-27, 55). After confirming that defendant had

6

nothing in his hands, Ranger Loudermilk holstered his firearm. (T-27). He placed defendant in handcuffs for safety reasons, and told defendant that he was not under arrest. (Id.).

Ranger Loudermilk asked defendant why he was trying to hide and where was the gun. (T-27, 56). Defendant stated he tried to hide because he did not know who they were and denied that he had a gun. (T-28, 56). Ranger Loudermilk asked again about the gun and asked if it was in the camper. (T-28). Defendant continued to deny that he had a gun. (T-29). The Trooper then advised Ranger Loudermilk that a gun was lying on the ground right behind defendant. (Id.). Ranger Loudermilk and defendant walked back to where the gun was lying on the ground. (Id.). Ranger Loudermilk took possession of the gun. (Id.). He asked defendant if it was loaded. (T-29, 56.). Defendant stated that it was. (Id.).

Ranger Loudermilk asked Defendant a few more questions related to his investigation into the hunting violations that he suspected Defendant had committed. (T-30). They walked over to the area near the camper. (T-30, 57). As they walked, Defendant asked Ranger Loudermilk if he would remove the handcuffs. (T-57). Ranger Loudermilk told Defendant that he would when they got

to the camper. (T-57). When they got to the camper, Ranger Loudermilk told defendant to sit at the picnic table and he removed the handcuffs. (T-30, 57).[1]

## ARGUMENT AND CITATION TO AUTHORITY

I.  **Ranger Loudermilk's Initial Entry on the Resort Property and his Investigation of the Hunting Blind Did Not Implicate the Fourth Amendment Because Each Action Occurred on Open Fields.**

Ranger Loudermilk's initial entry onto the resort property and the subsequent investigation of the hunting blind were both (1) affirmatively authorized by Georgia law, *see* O.C.G.A. § 27-1-20(6) (conservation officers have authority "To go upon property outside of buildings, posted or otherwise, in the performance of their duties"), and (2) *not* prohibited by the Fourth Amendment. Defendant challenges the latter, contending such entry violated his reasonable expectation of privacy under the Fourth Amendment. His challenge should be rejected because the areas searched by Ranger Loudermilk were located in open fields.

### A. The Fourth Amendment Does Not Protect Open Fields

---

[1] Ranger Loudermilk administered field sobriety tests on Defendant to determine if he was intoxicated while hunting. The sobriety testing occurred after the rifle was seized and after Defendant admitted he knew the rifle was loaded and is not relevant to the Government's arguments herein.

The Fourth Amendment does not proscribe the search of open fields. *United States v. Noriega*, 676 F.3d 1252, 1262 (11th Cir. 2012). By contrast, it does protect a person's house and the area immediately surrounding the house—called the curtilage. *Id.* This is a black-and-white distinction: "***a government agent's physical intrusion on an area beyond the home's curtilage is of no Fourth Amendment significance***" whatsoever. *Id.* (emphasis added) (citing *United States v. Jones*, 565 U.S. 400, 411 (2012)).[2] So, whether a search of an area outside the home implicates the Fourth Amendment at all depends on whether the search took place on the curtilage of the home or in open fields. Here, it unquestionably occurred on the latter.

The dividing line between curtilage and open fields turns on "whether an individual reasonably may expect that the area in question should be *treated as the home itself*." *Id.* (emphasis added). This inquiry is guided by the four factors laid down by the Supreme Court in *Dunn*:

> (1) the *proximity* of the area claimed to be curtilage to the home; (2) the *nature of the uses* to which the area is put; (3) whether the area is included *within an enclosure surrounding the home*; and (4) the steps the resident takes to protect the area from observation.

---

[2] Even the authority cited by Defendant undermines his position—in *United States v. Seidel*, the court makes clear that, far from protecting the entire property, "the Fourth Amendment protects . . . the home and the curtilage of the home, but nothing more." 794 F. Supp. 1098, 1102 (S.D. Fla. 1992).

*Id.* (citing *United States v. Dunn*, 480 U.S. 294, 300 (1987)) (emphasis added). Here, Defendant's Constitutionally-protected "home" was his mobile home, as he admits in his brief. (Br. 7). Thus, under *Dunn*, the Fourth Amendment only protects the area that should be treated "as the [mobile] home itself." *See Noriega*, 676 F.3d at 1262.

Defendant concedes that *Dunn* governs this case. (Br. 7–10). But his analysis of the four factors is misguided—rather than addressing the critical distinction between curtilage and open fields, he uses the factors as a vague, generalized barometer of privacy. As a result, he improperly conflates his home and its curtilage—and the associated protections—with the entirety of the land belonging not only to him, but to the resort at large.

### B. The Search of the Hunting Blind Occurred on Open Fields

Because the hunting blind is located on Defendant's property[3] and situated closer to his home, the analysis begins there. Application of the

---

[3] Under the analysis of the *Dunn* factors, ownership of the property investigated is assumed. *See, e.g.*, *Noriega*, 676 F.3d at 1262 (outbuilding located on private property but outside of curtilage). Here, the Government does not contest that the hunting blind and trailer were on property owned by Defendant.

*Dunn* factors makes clear that the area around the hunting blind[4] does not fall within the curtilage of the mobile home and should *not* be treated "as the home itself." *See Noriega*, 676 F.3d at 1262.

### 1. Proximity of the area to the home

The first factor is the area's proximity to the home. To lie within the curtilage, "an area must be an integral part of that group of structures making up the immediate domestic establishment of the home." *Taylor*, 458 F.3d at 1207. Areas or structures as close as thirty yards away have been held to be too far to establish that nexus. *United States v. Hatch*, 931 F.2d 1478, 1481 (11th Cir.1991); *see also Dunn*, 480 U.S. at 302 (barn 50 yards away); *Noriega*, 676 F.3d at 1262 (outbuilding 50–75 yards away); *Taylor*, 458 F.3d at 1207 (pond 60 yards away).[5]

---

[4] Notably, the open fields doctrine extends to the search of outbuildings as well. *United States v. Hatch*, 931 F.2d 1478, 1481 (11th Cir. 1991) ("there is no legitimate expectation of privacy in *outbuildings and open fields*, even if fenced, unless they are part of the curtilage" (emphasis added)). Thus, the search of the blind itself—which was open to view (Tr. 21)—falls under the same analysis as the area surrounding it.

[5] In light of this precedent, Defendant's reliance on *Seidel* is suspect. That opinion—from the Southern District of Florida in the early 90s—held that "a few hundred yards . . .constitutes 'in close proximity' to the house," and so may not be good law on this point. 794 F. Supp. at 1103.

Here, the hunting blind can hardly be said to be an integral part of the home. Although he did not measure the specific distance from the house, Ranger Loudermilk testified that to access the blind, he had to drive past the house on the road. (T-16). He had to stop at a spot designated by a telephone box because the hunting blind couldn't be seen from the road. (T-17). He then walked "maybe a hundred, couple hundred feet" through "thick underbrush" to get to a point where he could see the blind. (T-17). He testified that a worn path ran "all the way back" from the blind to the mobile home—implying that it covered a significant distance. (T-24). This distance and the intervening woods render the hunting blind area distinct from Defendant's mobile home. Accordingly, this factor supports the conclusion that the blind was situated in open fields.

### 2.  The nature of the use to which the area is put

The second factor is the nature of the use to which the area was put. "An area is more likely to be within the curtilage of a home if it is used for intimate activities of the home." *Noriega*, 676 F.3d at1262. "Intimate activities" are those "associated with domestic life and the privacies of the home." *United States v. Fuller*, 572 F. App'x 819, 821 (11th Cir. 2014) (citing *Dunn*, 480 U.S. at 300).

Here, the hunting blind was not used for any "intimate activity of the home." *Id.* Quite the opposite, in fact—by its very nature, hunting is an activity necessarily

associated with open fields.[6] Accordingly, this factor supports the conclusion that the blind was situated in open fields.

### 3. Whether the area is included within an enclosure surrounding the home

The third factor addresses enclosures surrounding the home. "In *Dunn* . . . the Court found it significant the house was surrounded by a fence that clearly established the area around the house as a distinct area within the property." *Taylor*, 458 F.3d at 1207 (citing 480 U.S. at 302–03). But, to invoke this factor, a fence must be around the *house* specifically; a fence bordering a larger property does not suffice. *Id.* at 1208 ("A perimeter fence around property does not create a constitutionally protected interest in all the open fields on the property."). Indeed, in *Dunn* itself, where the Court upheld a similar search, the Officers had entered private land and crossed *multiple* fences before searching the barn at issue. 480

---

[6] The open fields doctrine is precisely why O.C.G.A. § 27–1–20(a)(6), which authorizes conservation officers "[t]o go upon property outside of buildings, posted or otherwise, in the performance of their duties" is Constitutional, even when the hunting land is privately-owned. *See Sharp v. State*, 275 Ga. App. 487, 490 (2005) ("[W]hile it is true that statutes of this state cannot diminish rights guaranteed by the United States or Georgia Constitutions, the federal constitution does not proscribe entry on the type of property entered here without warrant by a law enforcement officer in pursuit of official duties.").

U.S. at 297. But they did *not* cross the fence enclosing the house itself—and it was this interior fence to which the court referred. *Id.* at 302.

Here, the only enclosure is around the *resort* property, not around the *house* itself. There was no fence surrounding the home, much less one surrounding both the home and the hunting blind. Accordingly, this factor supports the conclusion that the blind is situated in open fields.

### 4.  Steps the resident takes to protect the area from observation

The final factor is whether the resident has taken steps to protect the area from view. The area at issue here presents a unique situation that essentially negates this factor: although Defendant no doubt took some steps to shield the hunting blind from view, the purpose was to hide it from deer, not from people. Accordingly, this factor has no bearing on the analysis.

Three of the *Dunn* factors weigh in favor of open fields; one is irrelevant. In total, they make clear that Ranger Loudermilk's search of the hunting blind area "is of no Fourth Amendment significance" because that area was *not* part of the curtilage of Defendant's home. *Noriega*, 676 F.3d at 1262.

### C. The Entry onto the Resort Property Occurred on Open Fields

Because the hunting blind is not within the curtilage of the mobile home, it follows that, under *Dunn*, the outlying neighborhood property—which is further

14

away and is not on Defendant's own property—cannot be considered the curtilage of Defendant's home either. ***That fact alone suffices to end the discussion of the Fourth Amendment implications of Ranger Loudermilk's entry onto the broader resort property***. But Defendant has raised additional arguments about the nature of the resort, which are briefly addressed here.

Throughout his argument, Defendant mistakenly conflates his home and the protections it affords with the broader community property. (Br. 7–10). As a result, Defendant mistakenly claims that Ranger Loudermilk's entry on the *resort* property (not his personal property) violates the Fourth Amendment for what are essentially three reasons: (1) he has a communal ownership interest in the property,[7] (2) the resort is a nudist colony, and (3) the resort has a fence surrounding it. None of these three overcomes the basic open fields-curtilage distinction.

The first and third factors were already addressed in *Section A* above. As previously noted, ownership of the property at issue has no independent bearing in *Dunn* analysis, because it is assumed that the property searched belongs to the defendant. *See, e.g.*, *Noriega*, 676 F.3d at 1262. And the fence is relevant only to

---

[7] Defendant asserts—without providing evidence—that he is a "communal owner" of the resort property. (Br. 6). This discussion assumes that to be true.

the extent that it encloses the *house*, not the broader property. *Taylor*, 458 F.3d at 1208.

As for the second factor—the fact that the resort is a nudist colony—Defendant provides no authority to suggest that it establishes any privacy concern whatsoever, much less some reason sufficient to overcome the open fields doctrine. Nor does he provide any evidence that he actually engages in any nudist behavior. He was discovered wearing camouflage. (T-24). Accordingly, in spite of Defendant's claims, none of these has any bearing on the Fourth Amendment protections (or lack thereof) attached to the resort property.

Finally, even if the Fourth Amendment *did* extend to the neighborhood property (it doesn't), and even if Georgia Law did not expressly authorize the conservation ranger to enter onto the lands (it does), Defendant *still* overlooks a critical fact— namely, that Ranger Loudermilk actually *received consent* to enter the resort through the gate by someone with knowledge of the entry code. (Tr. 14). That too would have justified entry. *See United States v. Yeary*, 740 F.3d 569, 583 (11th Cir. 2014) ("A warrantless entry is valid when it is based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed authority over the premises."). For any number of reasons, then, Defendant's claim that Ranger Loudermilk illegally entered the resort premises is simply not

supported by the facts and the law. As demonstrated above, Ranger Loudermilk's entry onto the resort property did not implicate Defendant's Fourth Amendment rights.

## II.  Ranger Loudermilk did Not Violate the Fourth Amendment When he Approached the Mobile Home Because the Approach Meets the Knock and Talk Exception to the Warrant Requirement

After investigating the hunting blind, Ranger Loudermilk decided to approach the house and talk with the resident. That step was imminently reasonable by any measure, including the Fourth Amendment, which allows officers to approach a front door just like any other citizen.

An officer is justified in approaching a private residence to knock on the door to investigate under the "knock and talk" exception to the warrant requirement. *United States v. Taylor*, 458 F.3d 1201 (11th Cir. 2006). In *Taylor*—a similar felon-in-possession of a firearm case—police responded to the location of a pair of 911 calls in which the caller hung up without saying anything. *Id.* at 1203. The rural, five-acre property was surrounded by a fence and included a house, a barn, and a pond. *Id.* The officer entered the property through the unlocked gate and went up to the house. *Id.* The defendant walked up from outside the house and approached the officers at the front door. *Id.* He explained that he had called because he and his girlfriend had gotten into an argument. *Id.* He then consented to a search of the

17

premises. *Id.* The officer discovered a shotgun lying near the pond. *Id.* The defendant admitted to having stashed the gun because he was a felon and didn't want to get caught with it. *Id.* at 1204.

At the suppression hearing, the defendant argued that the entry onto and search of the premises violated the Fourth Amendment such that the shotgun and his statements must be suppressed. *Id*. The court disagreed, holding that the approach to the door was justified under the knock and talk exception. *Id.* ("Absent express orders from the person in possession, ***an officer may walk up the steps and knock on the front door of any man's castle, with the honest intent of asking questions of the occupant thereof***." (internal quotations omitted) (emphasis added)).

Here, before encountering Defendant, Ranger Loudermilk approached the mobile home for the limited purpose of a knocking and talking with a resident. (T-23–24). Even though he had already searched other parts of the property, he testified that that he went to the house to "speak with whoever was there" about "possible [hunting] violations," not to search the house. This was a reasonable and legitimate step in the investigation. Further, at that point, he did not yet know whether the homeowner and illegal hunter were the same person.[8]

---

[8] The tipster had stated only that there was "someone" hunting on the land. (Tr. 8).

Ranger Loudermilk's approach to the mobile home falls squarely within the knock and talk exception outlined in *Taylor*. Thus, standing at the front door, he by no means violated the Fourth Amendment.

### III. Ranger Loudermilk Did Not Violate the Fourth Amendment when he Searched the Area Near Defendant Because the Location was Not Protected and/or Because the Exigent Circumstances Justified the Search

Ranger Loudermilk assisted by the State Trooper ultimately discovered the rifle outside on the ground near where the Defendant was stopped, twenty or thirty yards and down a hill from the house (called the "Stop Area" throughout the discussion below). (T-24, 53). The Trooper accompanying Ranger Loudermilk first saw the gun in plain view from his vantage point at the Stop Area. (T-29). He didn't have to search through any containers, peer into any buildings, or dig through any ground to identify it. (T-29). He saw it from where he stood. So, the key question—really, a very basic one—is whether the officers had the authority simply to walk the twenty or thirty yards from the front door to the Stop Area.[9]

---

[9] The discovery of the gun was essentially independent of the stop. Ranger Loudermilk did not find the gun by frisking Defendant. (Tr. 27–29). Nor did Defendant make a statement leading to the gun. (Tr. 27–29). Rather, the accompanying Trooper saw the gun in plain view from his vantage point. (Tr. 29). Thus, for purposes of this case, the only relevant question is whether the officers had the authority to search that area.

They did. The search of the Stop Area—as with previous steps in the investigation—was entirely reasonable under the circumstances. More importantly, it was Constitutional, for two independent reasons. The first reason is the location: the previous searches were valid because of the open fields doctrine and the knock-and-talk exception to the warrant requirement. Here, because the search of the Stop Area occurred outside the house where the officers met Defendant after knocking on his front door, it necessarily falls within one of these two. *See Taylor*, 458 F.3d at 1205 (discussing both doctrines).

Of course, as discussed in *Part I* above, if the search occurred in open fields, it does not implicate the Fourth Amendment at all. And this seems the likelier scenario. But if the court finds that the area did fall within the curtilage of Defendant's mobile home, the knock-and-talk exception still applies. These alternative possibilities are addressed in *Sections A* and *B*, respectively.

The second reason derives from the exigent circumstances. Even if the Fourth Amendment would have otherwise protected that location, the Defendant's suspicious behavior, coupled with the likelihood that he possessed a gun, justified the officers' decision to approach him. Their actions ensured their safety, as well as his. The discussion of these exigent circumstances is taken up in *Section C*.

## A. The Search of the Stop Area Occurred in Open Fields

It isn't necessary to repeat the entire discussion of curtilage and open fields, discussed above in *Part I*, so the analysis below will be appropriately abbreviated. The critical determination here is whether the Stop Area was within the curtilage of the mobile home. *See Noriega*, 676 F.3d at 1262. Here, as with the hunting blind, in applying the four *Dunn* factors, the court should find that the Stop Area was *not* within the curtilage.

### 1. Proximity of the area to the home

In *Hatch*, the court held that an outbuilding thirty yards away was *not* within the curtilage. 931 F.2d at 1481; *see also Dunn*, 480 U.S. at 302 (barn 50 yards away); *Noriega*, 676 F.3d at 1262 (outbuilding 50–75 yards away); *Taylor*, 458 F.3d at 1207 (pond 60 yards away). Here, Ranger Loudermilk testified that the Stop Area was twenty to thirty yards from the house, a similar distance to that in *Hatch*. (Tr. 24).[10] He also testified it was down a hill. (Tr. 53). That distance is sufficient to distinguish the Stop Area from the mobile home. Accordingly, this factor supports the conclusion that the Stop Area is situated in open fields.

### 2. The nature of the use to which the area is put

---

[10] After dropping the rifle, Defendant did move from his initial position toward the officers, but he only walked approximately ten feet. (Tr. 24).

Ranger Loudermilk did not testify about the specific nature of the use to which the area was put. It was, however, an outdoor area, rather than any sort of outbuilding. In *Noriega*, the fact that the officers searched a pond cut against finding it was in the curtilage because a pond and a home serve different purposes. *Noriega*, 676 F.3d at1262. ("An area is more likely to be within the curtilage of a home if it is used for intimate activities of the home."). Here, the court should not attribute to undeveloped land the same treatment as the home itself. Accordingly, this factor supports the conclusion that the Stop Area is situated in open fields.

### 3. Whether the area is included within an enclosure surrounding the home

As discussed above, the only enclosure is around the *resort* property, not around the *house* itself. There was no fence surrounding the home, much less one surrounding both the home and the Stop area. Accordingly, this factor supports the conclusion that the Stop Area is situated in open fields.

### 4. Steps the resident takes to protect the area from observation

The final factor is whether the resident has taken steps to protect the area from view. There is nothing to suggest that any such steps were taken. Accordingly, this factor supports the conclusion that the Stop Area is situated in open fields.

Here, all four of the *Dunn* factors ultimately weigh in favor of open fields. Thus, Ranger Loudermilk's search of the Stop Area "is of no Fourth Amendment

significance" because that area was *not* part of the curtilage of Defendant's home. *Noriega*, 676 F.3d at 1262.

### B. The Officers' Movements Toward Defendant was Within the Scope of the Knock and Talk Exception

Even if the Court finds that the search of the Stop Area did not take place in open fields, the knock and talk exception still applies. In addition to allowing an approach to the door, the knock and talk exception *also* allows an officer to leave the front door to approach an individual standing nearby. *See Taylor*, 458 F.3d at 1204–05 (noting that "to the extent that the Officers moved away from the front door and toward [the defendant] when they heard him," that movement was still justified by the exception). In *Taylor*, the officer moved away from the door toward the defendant when he shouted to them. *Id.* at 1205 ("The officers heard Taylor shout to them, and simply moved toward him").

Here, similarly, Ranger Loudermilk moved away from the door toward the defendant when he heard and saw him standing nearby. (Tr. 24). Just like in *Taylor*, the knock and talk exception allows for that common-sense movement. That means that, even if the gun was found within the curtilage, Ranger Loudermilk did *not* violate the Fourth Amendment by stepping away from the door to approach Defendant standing nearby.

### C. No Warrant was Needed to Search Because Defendant's Suspicious Actions and Likely Possession of a Weapon Created Exigent Circumstances

When Ranger Loudermilk first saw him, Defendant behaved unusually, kneeling down in an apparent attempt to hide. (T-24–25). He was holding something in his hands. (T-24). His erratic behavior, coupled with the likelihood that he had a gun, created a dangerous situation for the officers. In light of the exigent circumstances, Ranger Loudermilk's decision to approach Defendant was both reasonable and safe. Indeed, an officer who ignored such behavior would not only be derelict in his duty as an investigator, he would be put himself at risk. *See Montanez v. Carvajal*, 889 F.3d 1202, 1210 (11th Cir. 2018) ("It does not meet the needs of law enforcement or the demands of public safety to require Officers to walk away from a situation like the one they encountered here.").

Under such circumstances, his action also comported with the Fourth Amendment. An officer "may enter a private premises and conduct a search if exigent circumstances mandate immediate action." *Id.* at 1208 (internal quotations omitted) (citing *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002)). Of the possible exigencies, risk to life is the most significant. *Holloway*, 290 F.3d at 1337 ("It is difficult to imagine a scenario in which immediate police action is more justified than when a human life hangs in the balance."). Assuming Ranger

Loudermilk perceived a risk to life, there's no doubt that he could search an area *outside* the home—courts have repeatedly recognized that such exigency justifies warrantless entry *into* the home, an area that warrants higher constitutional protection. *See id.* at 1336–37 (listing cases).[11]

Here, Ranger Loudermilk saw Defendant try to hide from him. (T-24–25). He knew that Defendant may have a gun and that he may have been drinking (T-27). Those facts created exigent circumstances because of the danger inherent in the situation. The safety of the officers as well as Defendant himself was paramount. Under those circumstances, Ranger Loudermilk acted reasonably by walking the twenty or thirty yards toward Defendant. More than reasonable, in fact—he acted exactly as a law enforcement officer should.

**IV.    Ranger Loudermilk did not Violate the Fourth Amendment when he Seized the Gun Because Defendant Abandoned it and it Was in Plain View.**

---

[11] Even if Defendant's behavior was precipitated by the sight of the officers,  the exigency was brought about by the appearance or conduct of the officer—assuming that conduct does not itself violate the Fourth Amendment—does not prevent the exception from taking effect. *Kentucky v. King*, 563 U.S. 452, 461–62 (2011).

The final issue—the seizure of the gun—poses no Constitutional problems either.[12] Assuming the Officers were validly in the Stop Area, the justification for the seizure follows naturally for two reasons, each sufficient on its own to satisfy the dictates of the Fourth Amendment. First, Defendant abandoned the gun, relinquishing his right of privacy in it. Second, it was in plain view of the officers.

### A. Defendant Abandoned the Gun

Defendant has no right to challenge the seizure of the gun because he abandoned it. *United States v. Sparks*, 806 F.3d 1323, 1342 (11th Cir. 2015) (citing *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973) (en banc)) ("It is settled law that one has no standing to complain of a search or seizure of property he has voluntarily abandoned."). In particular, a person abandons property when he stashes it after seeing a law enforcement officer approach. *Id.* (citing *United States v. McKennon*, 814 F.2d 1539, 1545–46 (11th Cir.1987)) (***"[A] person who makes a decision to leave his property containing contraband when law enforcement approaches or seeks to examine the property likewise abandons the property and loses standing to challenge its seizure.***" (emphasis added)).

---

[12] Notably, Defendant does not argue *any* independent reason why the seizure itself violates the Fourth Amendment. Instead, he states briefly only that the seizure was fruit of the poisonous tree of the entry onto the property. (Br. 10).

That's exactly what Defendant did here. He saw Ranger Loudermilk, ducked down, ditched the gun, and walked away from the spot where it was stashed. (T-24–27). Further, when Ranger Loudermilk asked, Defendant denied that the gun was there, claiming he didn't have a gun. (T-27–29). Of course, this was not true, but it further highlights that Defendant abandoned the gun. Accordingly, Defendant has no right to challenge the seizure (nor does he).

### B. The Gun was in Plain View

Even if Defendant retained some semblance of standing in the abandoned gun, Ranger Loudermilk was justified in seizing it, because it was in plain view.

> The plain view doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.

*Fish v. Brown*, 838 F.3d 1153, 1166 (11th Cir. 2016) (internal quotations omitted). The officers' lawful access was explained in *Part III* above. The only remaining question was whether the incriminating character of the gun was immediately apparent, *i.e.*, whether Ranger Loudermilk had probable cause to seize it.

It was, and he did. When he saw the gun, Ranger Loudermilk had probable cause to believe that Defendant had committed hunting violations, including

hunting deer over bait,[13] hunting deer without wearing orange,[14] and hunting under the influence of alcohol.[15] He had probable cause from the tip, his investigation which corroborated the tip, and Defendant's suspicious behavior. For each hunting violation, the gun would be competent evidence. Its incriminating nature was thus immediately apparent to the officers. Accordingly, because the gun was in plain view, Ranger Loudermilk did not violate the Fourth Amendment by seizing it.

## V. Defendant's Fifth Amendment Right Was Not Violated When Ranger Loudermilk Questioned Him About The Rifle.

Defendant also moves to suppress statements that he made in response to questions Ranger Loudermilk asked him about the rifle on the basis that the admissions are the product of Ranger Loudermilk's unlawful intrusion onto Defendant's property and on the ground that Defendant was under arrest at the time and he was not advised of his Miranda rights. (Br. 10-12). The Government's position regarding whether Ranger Loudermilk violated Defendant's Fourth Amendment rights by going onto the property has been thoroughly set forth above; therefore, the Government relies upon its response to Defendant's Fourth

---

[13] See O.C.G.A. § 27-3-9(4).

[14] See O.C.G.A. § 27-3-40.

[15] See O.C.G.A. § 27-3-7(b)(1).

28

Amendment claim in response to Defendant's Fifth Amendment claim. In short, at no time prior to the time Defendant answered questions about the rifle did Ranger Loudermilk engage in any action that violated Defendant's Fourth Amendment rights.

Because defendant was not under formal arrest when he was questioned about the rifle, no Miranda warnings were required. In order for Miranda warnings to be required before incriminating statements are admissible at trial, the defendant must under de facto arrest or his freedom of movement must be restrained to the degree associated with de facto arrest. *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2000).

The Government concedes that at the time Ranger Loudermilk placed defendant in handcuffs a seizure occurred. However, notwithstanding the fact that defendant was handcuffed, the seizure was a brief investigatory seizure requiring only a showing of reasonable suspicion, not a de facto arrest requiring probable cause.

When determining if an encounter constituted a de facto arrest, several factors should be addressed, including: the law enforcement purposes to be served by the stop, the time needed to effectuate the purposes, the law enforcement officer's diligence in pursuing the investigation, and the scope and intrusiveness of the detention. *See United States v. Sharpe*, 105 S. Ct. 1568, 1575 (1985); *Acosta*, 363 F.3d at 1146 (same). And, "the most important factor 'is whether the [officer] detained [Defendant] to pursue a method of investigation that was likely to confirm or dispel [his] suspicions quickly, and with a minimum of interference.' " *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting *Hardy*, 855 F.2d at 759).

In resolving this issue, "[n]o bright line test separates an investigatory stop from an arrest. Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances." *Blackman*, 66 F.3d at 1576. The fact that law enforcement officers draw their weapons, order suspects out of their vehicles or to lie on the ground, conduct a frisk for weapons, handcuff or secure suspects, or ask for identification does not necessarily convert a stop into an arrest requiring probable cause. *See Acosta*, 363 F.3d at 1146-47; *Diaz-Lizaraza*, 981 F.2d at 1221; *United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983).

*United States v. North*, No. 116CR00309WSDJFK, 2017 WL 9473407, at *6 (N.D. Ga. Aug. 8, 2017), report and recommendation adopted, No. 1:16-CR-309-WSD, 2017 WL 3821854 (N.D. Ga. Sept. 1, 2017).

Handcuffing does not convert an investigative seizure into formal arrest. *See Cornelius v. City of Andalusia*, 600 F. Supp. 2d 1209, 1225 (M.D. Ala. 2009). In *Cornelius*, in order to investigate a tip that hunters were illegally hunting with bows at night, officers set up a roadblock in the area. Defendant's vehicle stopped at the roadblock and defendant quickly exited. It was not immediately clear to the officers that defendant did not have a weapon, plus he was still within the grab area

of the interior of the car; therefore, the officers drew their weapons on defendant and placed him in handcuffs while at the same time telling him he was not under arrest. Under these circumstances, which are remarkably similar to the facts of the instant case, the district court held that the officers acted reasonably to take protective measures for their safety and their actions did not transform an investigatory stop into an arrest. *Id. But see United States v. Shine,* 306 F. Supp. 3d 1322, 1331 (M.D. Ala. 2018)("the fact that he was handcuffed, placed against his vehicle and searched, questioned about possible drug activity, and then moved to the hood of the patrol car, all weigh strongly in favor of a custody finding" for Fifth Amendment purposes which require a different analysis than under the Fourth Amendment).

Here, Ranger Loudermilk was investigating a tip that a person on Defendant's property was illegally hunting over a baited field that day with a rifle. The information provided by the tipster had been substantially corroborated by Ranger Loudermilk before he encountered Defendant. Upon seeing that Ranger Loudermilk was at the door to his trailer, Defendant bent down as if to hide something. Defendant did not immediately comply with Ranger Loudermilk's commands to get down on the ground. When he did comply, Ranger Loudermilk handcuffed him for officer safety at the same time telling him that he was not under arrest. Defendant initially denied that he had a rifle. Next, the Trooper assisting Ranger Loudermilk found a rifle near where Defendant crouched down. After seizing the rifle, Ranger Loudermilk asked Defendant if it was loaded and Defendant admitted that it was. Shortly thereafter, Ranger Loudermilk released

defendant from the handcuffs while he continued to investigate the potential state hunting violations that he suspected defendant had committed.

Ranger Loudermilk's action in briefly handcuffing defendant did not convert his encounter with defendant into formal arrest. Rather, it amounted to a brief investigative detention that did not rise to the level of formal arrest. As such, no Miranda warnings were required before Ranger Loudermilk asked defendant questions about the firearm.

**Conclusion**

For the foregoing reasons, the Court should deny Defendant's Motion to Suppress.

Respectfully submitted,

BYUNG J. PAK
*United States Attorney*

/s/WILLIAM L. MCKINNON, JR.
*Assistant United States Attorney*
Georgia Bar No. 495812
William.mckinnon@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

        Jeff Ertel

September 7, 2018

                   /s/ WILLIAM L. McKINNON, JR.
                   WILLIAM L. McKINNON, JR.
                   *Assistant United States Attorney*